# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

BITCO NATIONAL INSURANCE
COMPANY, as subrogee of
A.E. NEW, JR., Inc.,

      Plaintiff,

v.                                                   Case No. 3:17cv262/MCR/CJK
                                                     Lead Case

OLD DOMINION INSURANCE
COMPANY, *et al*.,

      Defendants.

_____/

BITCO NATIONAL INSURANCE
COMPANY, as subrogee of
A.E. NEW, JR., Inc.,

      Plaintiff,

v.                                                   Case No. 3:17cv326/MCR/CJK
                                                     Member Case

SOUTHERN-OWNERS INSURANCE
COMPANY and NATIONAL TRUST
INSURANCE COMPANY,

      Defendants.

_____/

## <u>ORDER</u>

This matter is before the Court on six motions: (1) BITCO National Insurance

Company, as subrogee of A.E. New, Jr., Inc.'s ("BITCO") motion for summary

judgment on liability against Old Dominion Insurance Company ("Old Dominion"),

Starr Indemnity & Liability Company ("Starr"), and Crum & Forster Specialty Insurance Company ("Crum"), ECF No. 54; (2) BITCO's motion for summary judgment on liability against Southern-Owners Insurance Company ("Southern-Owners") and National Trust Insurance Company ("National Trust"), ECF No. 57; (3) Southern-Owners' motion for summary judgment against BITCO, ECF No. 66; (4) National Trust's motion for summary judgment on liability against BITCO, ECF No. 88; (5) Crum's motion for summary judgment against BITCO, ECF No. 100; and (6) BITCO's motion to strike the affidavits filed by Southern-Owners, or in the alternative, to file a sur-reply, ECF No. 95.[1]  The Court's rulings are set forth below.

## I.    Background

This consolidated action involves an insurance coverage dispute over the obligation, if any, of various insurance companies to defend and indemnify BITCO, as subrogee of A.E. New, Jr., Inc. ("AE New"), a general contractor, against state court claims for property damage due to allegedly defective work performed by their insureds, who served as subcontractors for the construction of the Central Water

---

[1] BITCO's motion for summary judgment on liability against Starr, ECF No. 54, was rendered moot on April 12, 2018, when Starr was dismissed with prejudice.  *See* ECF No. 70. Similarly, National Trust's motion for summary judgment against BITCO was rendered moot on February 6, 2019, when National Trust was dismissed with prejudice.  *See* ECF No. 114.

Reclamation Facility project ("the Project") for the Emerald Coast Utilities Authority ("ECUA") in Pensacola, Florida.[2]

In February 2009, ECUA hired AE New as general contractor for the Project. AE New subcontracted various portions of the construction work to Area Glass, Inc. ("Area Glass") and West Coast Metal Roofing & Construction, LLC ("West Coast Metal").[3] The terms of their respective subcontracts required each subcontractor to, *inter alia*, indemnify AE New for all damages claims "arising out of or resulting from" the subcontractor's "negligent acts or omissions" in the performance of its work on the Project.[4] The subcontracts also required each subcontractor to maintain commercial general liability insurance naming AE New as an additional insured.[5]

As per the subcontracts, both Area Glass and West Coast Metal obtained commercial general liability policies ("the CGL policies") with the requisite

---

[2] The lead case, Case No. 3:17cv262, was filed by BITCO against: (1) Old Dominion, as an insurer for subcontractor Area Glass; (2) Crum, as an insurer for subcontractor West Coast Metal; and (3) Starr, as a second insurer for subcontractor West Coast Metal. *See* Complaint, ECF No. 1. The member case, Case No. 3:17cv326, was filed by BITCO against: (1) Southern-Owners, as a second insurer for subcontractor Area Glass; and (2) National Trust, as insurer for Lowery Industrial. *See* First Amended Complaint, ECF No. 42.

[3] The record reflects that dozens of subcontractors worked on the Project. *See, e.g.*, List of Subcontractors, ECF No. 1-3 at 22. Only Area Glass and West Coast Metal's work remains at issue in this litigation.

[4] The relevant provisions of Area Glass and West Coast Metal's subcontracts are substantively identical; therefore, the Court analyzes them together. *See* Area Glass Subcontract, ECF No. 1-7 at 6; West Coast Metal Subcontract, ECF No. 1-29 at 7.

[5] *See* Area Glass Subcontract, ECF No. 1-7 at 13; West Coast Metal Subcontract, ECF No. 1-29 at 15.

additional insured endorsements ("Endorsements").[6]  In particular, Area Glass was insured by Southern-Owners from October 28, 2008 through October 1, 2010, and by Old Dominion from October 1, 2010 through September 12, 2012.  West Coast Metal was insured by Crum from March 26, 2009 through December 1, 2010.  The Endorsements provide, in relevant part, that "[a] person or organization is an Additional Insured, only with respect to liability arising out of 'your work' for that Additional Insured by or for you . . . [i]f required in a written contract."  *See* Southern-Owners Policy, ECF No. 42-14 at 43.  The CGL policies define "your work" as "(1) [w]ork of operations performed by your or on your behalf; and (2) [m]aterials, parts or equipment furnished in connection with such work or operations."  *See id.* at 42.  For purposes of the instant motions, the Court assumes that AE New is an additional insured under Area Glass and West Coast Metal's CGL policies, pursuant to the subcontracts and Endorsements.

After construction at the Project was complete, ECUA retained an engineering firm to inspect the building.  The engineering firm issued two reports identifying a number of construction defects and deficiencies on the Project.  *See* Engineering Reports, ECF No. 1-3 at 140-204.  ECUA then served a notice of claim on AE New, pursuant to Florida Statutes 558.004.[7]  *See id.* at 138-39, 142.  The notice of claim

---

[6] The relevant provisions of the Southern-Owners, Crum, and Old Dominion Endorsements are substantively identical; therefore, the Court discusses them together.

[7] Florida Statutes 558.004 provides, in relevant part, that:

advised AE New of the discovery of the purportedly defective work set forth in the engineering firm's reports and provided AE New an opportunity to inspect and cure the defects. *See id.*

At some point thereafter, AE New filed a lawsuit against ECUA and two other defendants in the Circuit Court for Escambia County, Florida, raising breach of contract claims related to their contract for the Project's construction. ECUA responded with an Amended Answer and Counterclaim ("the state court counterclaim"), in which it asserted claims of breach of contract and negligence against AE New based on the unresolved construction defects identified in the engineering reports. ECUA alleged that the defects had caused damage to various components of the Project and to other property.

AE New concluded that some of the allegedly defective work at the Project was performed by Area Glass and West Coast Metal.[8] Thereafter, AE New sent multiple letters to the two subcontractors and their insurers, invoking its rights as an

---

(1)(a) In actions brought alleging a construction defect [arising from work performed under a contract], the claimant shall, at least 60 days before filing any action . . . serve written notice of claim . . . on the person with whom the claimant contracted.

(b) The notice of claim must describe in reasonable detail the nature of each alleged defect and, if known, the damage or loss resulting from the defect.

[8] AE New also attributed some of the allegedly defective work and property damage to another subcontractor, Lowery Industrial. Lowery Industrial was insured by National Trust, which, again, has already been voluntarily dismissed with prejudice from this case. *See supra* note 1.

additional insured under the CGL policies and demanding a defense for the state court counterclaims. AE New, represented by attorneys provided by its own liability insurer, BITCO, is defending against the state court counterclaims and has also asserted third-party claims against Area Glass, West Coast Metal, and other subcontractors, seeking to recover from them any amounts for which AE New might be held liable. The current status of the state court lawsuit is unclear from the parties' filings in this federal case.

Two actions have been filed and consolidated for adjudication by this Court. First, on April 24, 2017, BITCO filed an action against Old Dominion, Crum, and Starr, seeking a declaration that they owed a duty to defend AE New against the state court counterclaim, pursuant to the terms of Area Glass and West Coast Metal's CGL policies, and alleging breach of contract based on the insurance companies' refusal to provide the requisite defense. Second, on May 8, 2017, BITCO filed an action against National Trust and Southern-Owners, alleging the same claims and seeking the same relief with respect to the additional insured provisions of the CGL policies for Lowery Industrial and Area Glass, respectively. Since that time, BITCO has voluntarily dismissed with prejudice its claims against Starr and National Trust. *See* ECF Nos. 70; 114. Thus, only the claims against Old Dominion, Crum, and Southern-Owners remain.

BITCO argues that it is entitled to summary judgment against each of the remaining defendant insurance companies because the allegations in the state court counterclaim triggered their duty to defend AE New, which they all refused to do. Each defendant separately opposes BITCO's motion and all but one defendant, Old Dominion, have moved for summary judgment in their own favor regarding the duty to defend.

## II.    Legal Standard

A district court applies the same legal standards when ruling on cross-motions for summary judgment as it does when only one party files a motion.  *Certain Underwriters at Lloyds, London Subscribing to Policy No. SA 10092-11581 v. Waveblast Watersports, Inc.*, 80 F. Supp. 3d 1311, 1316 (S.D. Fla. 2015).  "Cross-motions may, however, be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the controlling legal theories and material facts."  *Id*. (citing *United States v. Oakley*, 744 F.2d 1553, 1555-56 (11th Cir. 1984).

Summary judgment is appropriate where there are no genuine disputes of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A fact is "material" if, under the applicable substantive law, it might affect the outcome of the case.  *Hickson Corp. v. N. Crossarm Co*., 357 F.3d 1256, 1259-60 (11th Cir.

2004). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The burden of demonstrating the absence of a genuine dispute of material fact rests with the moving party. *Celotex*, 477 U.S. at 323. In determining whether the moving party has carried its burden, a court must view the evidence and factual inferences drawn therefrom in the light most favorable to the non-moving party. *Liberty Lobby*, 477 U.S. at 255; *Allen v. Tyson Foods*, 121 F.3d 642, 646 (11th Cir. 1997). "Summary judgment is appropriate in declaratory judgment actions seeking a declaration of coverage when the insurer's duty, if any, rests solely on the applicability of the insurance policy, the construction and effect of which is a matter of law." *Northland Cas. Co. v. HBE Corp.*, 160 F. Supp. 2d 1348, 1358 (M.D. Fla. 2001).

## III. Discussion[9]

The question of whether the defendant insurance companies owe a defense to AE New turns on whether the allegations in the state court counterclaim bring that action within the scope of the CGL policies' coverage. *See Jones v. Florida Ins. Guar. Ass'n, Inc.*, 908 So. 2d 435, 443 (Fla. 2005); *Lime Tree Village Cmty. Club*

---

[9] "[T]he law of the state where an insurance contract [wa]s executed is the law that governs the rights and liabilities of the parties in determining an issue of insurance coverage." *Rando v. Gov't Emp. Ins. Co.*, 39 So. 3d 244, 247 (Fla. 2010) (internal marks omitted). In this case, there is no dispute that the subject CGL policies were issued and executed in Florida. Therefore, the Court applies Florida's substantive law in determining the coverage issues presented here.

*Ass'n, Inc. v. State Farm Gen. Ins. Co.*, 980 F.2d 1402, 1405 (11th Cir. 1993). Under Florida law, "the general rule is that an insurance company's duty to defend an insured is determined solely from the allegations in the complaint against the insured, not by the actual facts of the cause of action against the insured, the insured's version of the facts or the insured's defenses." *Amerisure Ins. Co. v. Gold Coast Marine Distribs., Inc.*, 771 So.2d 579, 580-81 (Fla. 4th DCA 2000); *see also Jones*, 908 So. 2d at 442-43. If any factual allegations "fairly and potentially" fall within the policy's coverage, the insurer has a duty to defend the action. *See Jones*, 908 So. 2d at 443. Thus, even where the underlying action "alleges facts partially within and partially outside the scope of coverage, the insurer is obligated to defend the entire suit." *Trizec Props., Inc. Biltmore Constr. Co., Inc.*, 767 F.2d 810, 811-12 (11th Cir. 1985); *see also Pentecost v. Lawyers Title Ins. Corp.*, 704 So. 2d 1103 (Fla. 1st DCA 1997). However, no obligation to defend arises where the facts alleged do not state a claim for which there would be coverage or where a policy exclusion applies. *WPC Indus. Contractors, Ltd. v. Amerisure Mut. Ins. Co.*, 720 F. Supp. 2d 1377, 1380 (S.D. Fla. 2009). Any doubts regarding whether the duty to defend exists in a particular case must be resolved against the insurer and in favor of

the insured. *Jones*, 908 So. 2d at 443; *Grissom v. Commercial Union Ins. Co.*, 610 So. 2d 1299, 1307 (Fla. 1st DCA 1992).[10]

## A.  Old Dominion and Southern-Owners

BITCO argues that Old Dominion and Southern-Owners owe a duty to defend because the state court counterclaim and accompanying engineering reports allege an "occurrence" of "property damage" that is covered by the CGL policies of Area Glass, their insured.  In response, Old Dominion and Southern-Owners argue that they have no duty to defend because the state court counterclaim does not allege that Area Glass's work was defective or that it resulted in property damage as defined in their CGL policies.[11]  The Court agrees.

The subject CGL policies are standard policies that cover, in pertinent part, "property damage" caused by an "occurrence."  *See* Southern-Owners Policy, ECF No. 42-14 at 22.  An "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  *See id*. at 40.  "Property damage" means "[p]hysical injury to tangible property, including

---

[10] The parties agree that the pending motions must be resolved by reference to the respective subcontracts, the applicable CGL policies, the state court counterclaim, and the exhibits attached to the state court counterclaim, which include Emerald's 558 letter to AE New and the two engineering reports.

[11] Because this argument identifies a coverage problem that the Court finds dispositive, the merits of the companies' remaining arguments—that Southern-Owners' Products-Completed Operations Hazard Exclusion precludes coverage and that AE New failed to cooperate with Old Dominion's internal investigation of the state court counterclaims—are not addressed.

all resulting loss of use of that property . . . or [l]oss of use of tangible property that is not physically injured." *Id*. at 41. The policies specifically exclude from coverage property damage to "your work," *see id*. at 27, which is defined as "[w]ork or operations performed by you or on your behalf" and "[m]aterials, parts or equipment furnished in connection with such work or operations," *id*. at 42.

Reading these standard CGL policy provisions together, Florida courts have consistently held that faulty or defective construction work that causes damage to other tangible property can constitute covered "property damage" caused by an "occurrence." *See U.S. Fire Ins. Co. v. J.S.U.B., Inc.*, 979 So.2d 871, 888, 891 (Fla. 2007); *see also Amerisure Ins. Co. v. Auchter, Co.*, No. 3:16cv407, 2018 WL 4293149, at *11 (M.D. Fla. March 27, 2018) ("[F]aulty workmanship or defect work that has damaged the otherwise nondefective completed project has caused 'physical injury to tangible property' within the plain meaning of" a standard CGL policy). According to BITCO, this authority is the source of Old Dominion and Southern-Owners' duty to defend AE New against the state court counterclaim.

There are two problems with BITCO's position. First, neither the state court counterclaim nor the accompanying engineering reports describe faulty or defective construction work that is "fairly and potentially" attributable to Area Glass. Under the subcontract, Area Glass was responsible for work related to doors and windows on the Project, which included installing aluminum framed entrances and storefront

windows, as well as aluminum door hardware. *See* Area Glass Subcontract, ECF No. 1-7 at 9-10. Consequently, only construction defects involving the aluminum doors or windows can "fairly and potentially" implicate Area Glass's work. No such construction defects are described in the relevant state court documents. Indeed, none of the documents even mentions doors. Windows are referenced twice in the engineering reports, but only to describe their appearance and with no allegation that the windows were defective or improperly installed. *See* Engineering Reports, ECF No. 1-3 at 148, 156. In short, nothing in the state court counterclaim and accompanying engineering reports can be "fairly [or] potentially" read as a factual allegation of faulty or defective workmanship with respect to the doors and windows.

Second, none of the relevant state court documents allege that the installation or condition of the aluminum doors and windows caused any of the property damage observed throughout the Project. The engineering reports describe an array of moisture-related property damage, including staining, algae accumulation, vegetation growth, efflorescence, moisture intrusion, and other water damage. However, there is no suggestion that the doors and/or windows caused or contributed to these problems. Instead, the reports explicitly attribute the property damage to alleged defects in the PVC and standing seam roof systems, guttering and downspouts, walls and lintels (including through-wall flashings), joint and sealant

work, and masonry. Area Glass was not responsible for any of these aspects of the Project. Because none of the property damage is alleged to involve or relate to Area Glass's work on the aluminum doors and windows, it does not "fairly and potentially" fall within the general coverage of the subcontractor's CGL policies.

The Court agrees with Old Dominion and Southern-Owners that BITCO extrapolates allegations about Area Glass from the engineering reports that the reports' authors themselves did not make and, in some instances, mischaracterizes the reports' findings and conclusions. For example, BITCO directs the Court to photographs of the Project that depict water staining and damage "at the west entry interior near windows installed by Area Glass," *see* Photograph No. 58, ECF No. 1-3 at 187, and claims this damage "may have been caused by [the subcontractor's] allegedly defective work." *See* ECF No. 85 at 10. This statement is inaccurate and, in fact, is contradicted by the reports, which expressly attribute the pictured water staining and damage to a lack of through-wall flashing and improper masonry weeps, neither of which was within Area Glass's scope of work. *See* Engineering Reports, ECF No. 1-3 at 147, 154, 156. Similarly, BITCO claims the engineering reports "found that flashing was not observed at window sills," which "caused moisture into the interior west covered entry." *See* ECF No. 85 at 11. Again, inaccurate. The reports expressly state first that "flashing *was* observed protruding from the [window] sills," *see* Engineering Reports, ECF No. 1-3 at 148 (emphasis added),

and later, that all window sills "appeared to have a flashing," *see id*. at 156. Photographs of the "typical window sill," in which sill flashing is plainly visible, were also included with the reports. *See* Photographs 60 & 85, ECF No. 1-3 at 188, 201. Nowhere in these reports did the engineers even remotely suggest that sill flashing issues caused or contributed to moisture problems in the interior west covered entry. To the contrary, the engineers concluded that "one of the main causes for moisture" in that area was the lack of through-wall sheet metal flashing, *see* Engineering Reports, ECF No. 1-3 at 156, which, again, was not within Area Glass's scope of work.

One final aspect of BITCO's claims against Old Dominion and Southern-Owners warrants additional comment. The state court counterclaim alleges that

> [AE New] (either itself and/or through its subcontractors) negligently constructed and/or installed certain components of the Project. As a result, the Project has been determined to have certain defects and deficiencies and to have work which fails to comply with the plans and specifications, all of which have caused property damage to certain building components and which have caused damage to other property.

*See* State Court Counterclaim, ECF No. 1-3 at 11. BITCO repeatedly insists, without citation to a single authority, that this statement, "standing alone"—that is, without reference to the accompanying engineering reports—"clearly" and "specifically" alleges property damage arising from Area Glass's defective work on the Project, and thus, triggers Old Dominion and Southern-Owners' duty to defend. This is incorrect.

To begin with, this allegation does not identify the work of Area Glass (or any other individual subcontractor, for that matter) as negligent or deficient. Since numerous subcontractors performed construction work on the Project, *see* List of Subcontractors, ECF No. 1-3 at 22, the Court may not infer solely from the above language that the state court counterclaims implicate Area Glass's work. *See Wackenhut Servs., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa*, 15 F. Supp. 2d 1314, 1321 (S.D. Fla. 1998) ("[I]nferences that can be made from the allegations of the complaint are not sufficient to trigger the duty to defend.") (quoting *Fun Spree Vacations, Inc. v. Orion Ins. Co*., 659 So. 2d 419, 421 (Fla. 3d DCA 1995). More significantly, the use of conclusory "buzz words" in a complaint—such as "negligently" or "deficiencies"—is insufficient to trigger a duty to defend under Florida law. *See State Farm Fire & Cas. Co. v. Steinberg*, 393 F.3d 1226, 1230 (11th Cir. 2004) (quoting *Gold Coast Marine*, 771 So. 2d at 580-81; *see also Auto-Owners Ins. Co. v. Elite Homes, Inc*., 676 F. App'x 951, 954 (11th Cir. 2017). The duty to defend arises only where the *factual* allegations in the underlying action fairly and potentially bring the suit within policy coverage. *Stephens v. Mid-Continent Cas. Co.*, 749 F.3d 1318, 1323 (11th Cir. 2014). In this case, the Court has already found that the factual allegations in the state court counterclaim fail to meet this standard, at least with respect to Area Glass's CGL policies. Therefore, Old Dominion and Southern-Owners owe no duty to defend AE New in that case.

B.    **Crum & Forster Specialty Insurance Company**

Crum concedes that the state court counterclaim and accompanying engineering reports allege defective work by its insured, West Coast Metal, but argues that it nonetheless has no duty to defend BITCO because none of the alleged property damage occurred during the applicable policy periods and, alternatively, the policy exclusion for Exterior Insulation and Finish Systems ("EIFS Exclusion") operates to preclude coverage.

Regarding Crum's first argument, the Court disagrees. For there to be coverage under the Crum CGL Policies, there must be "property damage" that "occur[ed] during the policy period." *See* Crum Policy, ECF No. 1-8 at 9; *see also Trizec*, 767 F.2d at 813 ("[I]t is the damage itself which must occur during the policy period for coverage to be effective."). The parties disagree about precisely when damage "occurs" for purposes of policy coverage. Crum argues that damage "occurs" when it is discovered and that the state court counterclaim indicates that the alleged damage was not discovered until 2013, which was after the latest Crum policy expired. In contrast, BITCO maintains that Florida follows an "injury-in-fact" theory, under which damage "occurs" at the moment when there is actual damage and the date of discovery is irrelevant.

Courts have developed four theories for determining when damage occurs under a CGL policy: (1) exposure; (2) manifestation; (3) continuous trigger; and (4)

injury-in-fact. *See Auto Owners Ins. Co. v. Travelers Cas. & Surety Co.*, 227 F.

Supp. 2d 1248, 1266 (M.D. Fla. 2002).

> Under the exposure theory, property damage occurs upon installation
> of the defective product. Under the manifestation theory, property
> damage occurs at the time damage manifests itself . . . The continuous
> trigger approach defines property damage as occurring continuously
> from [the] time of installation until the time of discovery. And injury-
> in-fact (which is also referred to as damage-in-fact) . . . is triggered
> when the property damage underlying the claim actually occurs.

*Id.* (internal citations omitted and emphasis removed).

The Florida Supreme Court has not yet considered which theory is correct.

The Eleventh Circuit has twice applied the injury-in-fact approach, on facts and

policy language materially similar to those presented here. *See Carithers v. Mid-

Continent Cas. Co.*, 782 F.3d 1240, 1247 (11th Cir. 2015) ("Property damage occurs

when the damage happens, not when the damage is discovered or discoverable.");

*Trizec*, 767 F.2d at 813 ("[T]he damage itself . . . must occur during the policy period

for coverage to be effective" and "[t]here is no requirement that the damages

'manifest' themselves during the policy period").[12] Although the court limited its

holdings to the specific terms of the policies before it, *id.* n.6 (refusing to determine

---

[12] Like the Crum CGL Policy, the policies in *Carithers* and *Trizec* applied to property
damage that occurred during the policy period. *See Carithers*, 782 F.3d at 1243; *Trizec*, 767 F.2d
at 813. Moreover, as in this case, the property damage in *Carithers* and *Trizec* was not alleged to
be latent, and the underlying actions were filed several years after the construction projects were
completed and the CGL policies had expired. *See Carithers*, 782 F.3d at 1243-45; *Trizec*, 767
F.2d at 812-13.

whether the manifestation theory is incorrect in all situations, but holding that the theory was "incompatible with the language of the policy at issue"), that fact does not change the outcome of this case. Again, the Crum CGL Policy is materially similar to the policies in *Carithers* and *Trizec*; therefore, the *Carithers* and *Trizec* analyses are binding here. The Court thus finds that the injury-in-fact approach is the appropriate trigger for coverage under the Crum CGL Policy. *See Trovillion Constr. & Dev., Inc. v. Mid-Continent Cas. Co.*, No. 6:12-cv-914, 2014 WL 201678, at *5 (M.D. Fla. Jan. 17, 2014) (adopting injury-in-fact approach); *Axis Surplus Ins. Co. v. Contravest Constr. Co.*, 921 F. Supp. 2d 1347 (M.D. Fla. 2012) (same).

To prevail at this stage then, Crum bears the burden of proving that the alleged property damage did not actually occur within the policy period. *See St. Paul Fire & Marine Ins. Co. v. Cypress Fairway Condo. Ass'n, Inc.*, 114 F. Supp. 3d 1231, 1237 (M.D. Fla. 2015) (citing *Vander Voort v. Universal Prop. & Cas. Ins. Co.*, 127 So. 3d 536, 538 (Fla. 4th DCA 2012)). On consideration, the Court finds that Crum has failed to carry this burden. The Crum CGL policies were in effect from March 26, 2009 through December 1, 2010. *See* Crum Letter, ECF No. 99-5 at 3. Although the state court counterclaim does not expressly allege the actual date the damage occurred, its language, "at least marginally and by reasonable implication," may be construed to allege that the damage attributable to Crum's insured (*i.e.*, water damage from defective metal roofing, flashing, gutter, and downspout work)

occurred between the commencement of construction in 2009 and the engineering expert's inspection of the Project in 2013. *See Trizec*, 767 F.2d at 813 (reaching same conclusion based on a factually similar complaint); *Axis*, 921 F. Supp. 2d at 1349 (same). Because the Crum policies were in effect for a portion of that time period, the state court counterclaim "fairly and potentially" alleges damages that could fall within the policies' coverage. Therefore, the Court finds that the timing of the alleged property damage does not relieve Crum of its duty to defend AE New against the state court counterclaim.

As to Crum's second argument, however, the Court finds that the EIFS Exclusion precludes coverage. Under Florida law, an insurer relying on an insurance policy exclusion to deny coverage "has the burden of demonstrating that the allegations of the [underlying action] are cast solely and entirely within the policy exclusion and are subject to no other reasonable interpretation." *Hartford Accident & Indem. Co. v. Beaver*, 466 F.3d 1289, 1296 (11th Cir. 2006). Again, even where the underlying action "alleges facts partially within and partially outside the scope of coverage, the insurer is obligated to defend the entire suit." *See Trizec*, 767 F.2d at 811-12. Exclusionary clauses are generally disfavored, so "Florida courts construe ambiguity in policy language liberally in favor of the insured and strictly against the insurer." *Hartford*, 466 F.3d at 1296.

The EIFS Exclusion in the Crum CGL policies states that the insurance does not apply to, *inter alia*, property damage arising out of: (1) the installation or application of an EIFS; or (2) the insured's work "with respect to any exterior component, fixture or feature of any structure if an [EIFS] is used on any part of that structure." *See* Crum Policy, ECF No. 100-3 at 39-40. To date, no Florida court has analyzed the scope of an EIFS exclusion in a CGL policy. However, numerous federal district courts have found that EIFS exclusions materially identical to the instant exclusion "clear[ly]" and "unambiguous[ly]" barred coverage for damage resulting from defective work performed on the exterior of a building if EIFS was used on any part of the building, even where the insured's work did not in any way come into contact with EIFS. *See Auchter*, 2017 WL 3584896, *23 (collecting cases); *see also First Mercury Ins. Co. v. Miller Roofing Enters.*, Case No. 2:11cv105, 2013 WL 662970, at *2-4 (W.D. Wash. Feb. 22, 2013). The Court agrees with this plain language reading of Crum's EIFS Exclusion. *See Auto-Owners Ins. Co. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000) ("Florida law provides that insurance contracts are construed in accordance with the plain language of the policies as bargained for by the parties."). There is no ambiguity here.

Applying the plain and unambiguous language of the CGL policy in this case, the Court finds that Crum has shown the allegations in the state court counterclaim to be "cast solely and entirely within" the EIFS Exclusion. In particular, the relevant

state court materials reflect that EIFS was used on "[e]xterior soffits and ceilings" throughout the Project. *See* Engineering Reports, ECF No. 1-3 at 147, 154. Consequently, the Crum EIFS Exclusion precludes coverage for "any" of West Coast Metal's "work or operations with respect to any exterior component" of the Project. *See* ECF No. Crum Policy, 100-3 at 39-40. West Coast Metal worked *only* on exterior components of the Project, as it was responsible for tasks related to roofing (including membrane waterproofing, flashing and trim), gutters, and downspouts. *See* West Coast Metal Subcontract, ECF No. 1-29 at 11. Indeed, there is no evidence or argument that West Coast Metal performed any interior work. Accordingly, the EIFS exclusion applies to preclude coverage for damages arising from any of the subcontractor's allegedly defective work.

BITCO cites a slew of cases in support of its argument that the Crum EIFS Exclusion does not preclude coverage here. All of these cases are materially distinguishable. In two of the cases, the EIFS Exclusion was far narrower in scope than the Crum EIFS Exclusion.[13] *See AIX Specialty Ins. Co. v. Universal Cas. Co.*, No. 4:12cv507, 2012 WL 6862489, at *10 n.67 (S.D. Tex. Dec. 27, 2012) (exclusion

---

[13] The instant EIFS exclusion also is much broader in scope than (and thus, is distinguishable from) the EIFS exclusion in the National Trust CGL policy, *see* ECF No. 38-3 at 38, which the Court construed in connection with a motion to dismiss at an earlier stage of this litigation, *see* Order, ECF No. 53 at 9. National Trust's EIFS exclusion, in pertinent part, barred coverage only for damage resulting from the insured's work on an exterior component of a building if EIFS was "used on the part of that structure containing that component." *See* ECF No. 38-3 at 38.

barred coverage for "claims or suits arising out of [EIFS] application, installation, use or sale"); *Ins. Corp. of Hannover v. Skanska USA Bldg., Inc.*, No. 1:05cv304, 2008 WL 2704654, at *4 (S.D. Tex. July 3, 2008) (endorsement excluded coverage for property damage arising from work on an EIFS or "any component or part thereof"). Two of the cases are factually distinct. *See Trinity Universal Ins. Co. v. Emp'rs Mut. Cas. Co.*, 592 F.3d 687, 693 (5th Cir. 2010) (underlying petition alleged damages that could have been caused by insured's interior masonry work); *Luxury Living, Inc. v. Mid-Continent Cas. Co.*, No. 4:02cv3166, 2003 WL 22116202, at *17 (S.D. Tex. Sept. 10, 2003) (underlying complaint alleged construction defects involving insured's work on interior components of the property, such as incorrect placement of a water heater and inadequate crawl space ventilation). Because of these critical distinctions, the foregoing cases offer little guidance here.

In a final effort to get around the EIFS Exclusion, BITCO argues that applying the exclusion as written would render the Crum CGL policies' coverage "illusory" and "inherently unreasonable." *See* ECF No. 117 at 3. This is incorrect. Under Florida law, in order for an exclusion to render a policy's coverage illusory, it must "completely contradict the insuring provisions," *Interline Brands, Inc. v. Chartis Specialty Ins. Co.*, 749 F.3d 962, 966 (11th Cir. 2014), and "eliminate all—or at least virtually all—coverage in a policy," *Zucker for BankUnited Fin. Corp. v. U.S. Specialty Ins. Co.*, 856 F.3d 1343, 1352 (11th Cir. 2017). In that scenario, Florida

courts conclude that the policy is ambiguous and resolve the ambiguity in favor of the insured. *See id.*; *see also Tire Kingdom, Inc. v. First S. Ins. Co.*, 573 So. 2d 885, 887 (Fla. 3d DCA 1990) ("An insurance policy cannot grant rights in one paragraph and then retract the very same right in another paragraph called an 'exclusion.'"). So, for example, where a policy explicitly covered certain intentional torts, but also had an exclusion barring coverage for "intended" injuries, the policy was illusory because the exclusion "swallowed up the insuring provision" and resulted in "complete nonsense." *See Purrelli v. State Farm Fire & Cas. Co.*, 698 So. 2d 618, 620 (Fla. 2d DCA 1997); *see also Princeton Express v. DM Ventures USA LLC*, 209 F. Supp. 3d 1252, 1260 (S.D. Fla. 2016) (finding policies illusory where they expressly covered advertising injuries but also excluded advertising injuries); *Waveblast Watersports*, 80 F. Supp. 3d at 1318-19 (finding policy illusory where it expressly covered parasailing but excluded watercrafts).

In this case, the EIFS Exclusion does not "swallow up" the insuring provisions of the Crum CGL policies like the exclusions in *Purrelli*, *Princeton Express*, and *Waveblast Watersports*. To the contrary, the insuring provisions of the Crum CGL policies expressly provide a wide range of coverage for bodily injury and property damage claims arising from West Coast Metal's faulty or defective work. *See* Crum CGL Policy, ECF No. 100-3 at 9. The EIFS Exclusion only precludes coverage for a small subset of claims—those arising from West Coast Metal's work on the

exterior of a building on which there is EIFS. *See id*. 39-40. While this is a significant exclusion (at least as applied in this case), it does not render the policy nonsensical or completely contradict the insuring provisions. Indeed, the policy still affords coverage for claims arising from West Coast Metal's work on the exterior of buildings without EIFS and to its work on a building's interior.

It is worth noting that the first of the Crum CGL policies, which clearly included the subject EIFS Exclusion, had already been in effect for over three months when West Coast Metal signed the subcontract with AE New.[14] Neither of these two entities appears to have considered the potential consequences of the Crum EIFS Exclusion in light of the nature of West Coast Metal's work on the Project. The costs of their failure to do so cannot be imposed on Crum, after the fact. *See Zucker*, 856 F.3d at 1353 (stating that "after the fact [insurance coverage] wishes are not enough to change before the fact [insurance] choices"). Policy exclusions "serve valid purposes when agreed to by consenting parties." *See id*.; *see also Interline Brands*, 749 F.3d at 967 ("[E]xclusions . . . allow creation of a policy that provides the insured the coverage it needs at a price it can afford. Without such exclusions, coverage would undoubtedly be more expensive."). West Coast Metal chose to buy the policy that it bought. It cannot change that choice now. AE New and BITCO

---

[14] Again, the first Crum CGL policy, No. GLO 150992, went into effect on March 26, 2009. *See* Crum Policy, ECF No. 99-3 at 2. West Coast Metal and AE New signed their subcontract on June 29, 2009. *See* West Coast Metal Subcontract, ECF No. 99-1.

cannot change the choice either.  The Court thus finds that the Crum EIFS Exclusion is valid, unambiguous, and operates to preclude coverage for the claims alleged against AE New in the state court counterclaim.  Therefore, Crum owes no duty to defend AE New in that case.

Accordingly, it is **ORDERED**:

1. BITCO's Motion for Summary Judgment on Liability, ECF No. 54, is **DENIED**.

2. BITCO's Motion for Summary Judgment on Liability, ECF No. 57, is **DENIED.**

3. Southern-Owners Insurance Company's Motion for Summary Judgment, ECF No. 66, is **GRANTED**.

4. National Trust Insurance Company's Motion for Summary Judgment on Liability, ECF No. 88, is **DENIED** as **MOOT**.

5. BITCO's Motion to Strike the Affidavits Filed by Southern-Owners, ECF No. 95, is **DENIED** as **MOOT**, as the Court did not consider the affidavits in ruling on the summary judgment motions in this case.

6. Crum & Forster Specialty Insurance Company's Motion for Summary Judgment, ECF No. 100, is **GRANTED**.

7. The Court **DECLARES** that Southern-Owners and Crum have no duty to defend AE New against the state court counterclaim, for the reasons stated in this Order.  The Clerk is directed to enter final summary judgment against BITCO and in favor of Southern Owners and Crum, tax costs against BITCO, and close the member case, No. 3:17cv326/MCR/CJK, for all purposes.

8. Old Dominion did not file a cross-motion for summary judgment against BITCO.  However, the Court's determination that Old Dominion had no duty to defend AE New is dispositive of the two parties' coverage dispute in this case.  Accordingly, the Court hereby

advises the parties that it is considering granting summary judgment *sua sponte* to Old Dominion, pursuant to Fed. R. Civ. P. 56(f)(1). Out of an abundance of caution, the parties are granted **10 days** from the date of this Order to respond to this notice, if they so wish. *See* Rule 56(f).[15] If no response is timely filed, the Court will enter an order granting summary judgment to Old Dominion and directing the Clerk to close the lead case.

**SO ORDERED**, on this 30th day of March, 2019.

*M. Casey Rodgers*

**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**

---

[15] *See also Artistic Entm't, Inc. v. City of Warner Robins*, 331 F.3d 1196, 1201-02 (11th Cir. 2003).